# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CLARITTE QUATTLEBAUM,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:10-cv-399

Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) terminating plaintiff's Social

Security benefits. This matter is before the Court on plaintiff's Statement of Errors (Doc. 7), the

Commissioner's response in opposition (Doc. 14), and plaintiff's reply memorandum. (Doc. 17).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1972. Plaintiff has a ninth or tenth grade "limited" education and no

past relevant work experience, but she has worked as a dishwasher and temporary laborer,

although her prior work has not been established as substantial gainful activity. (Tr. 23, 74, 79-

106). Plaintiff filed a Supplemental Security Income (SSI) application on February 15, 1994,

alleging disability due to mental problems. (Tr. 42-45, 70). Plaintiff's application was granted

with an onset date of February 1, 1994, on the basis that she met Listing 12.05 for mental

retardation and affective disorders. *See* Tr. 46. The Commissioner conducted a continuing

disability review and based on that review, the Commissioner determined that plaintiff's

previous favorable determination had been obtained by fraud or similar fault. (Tr. 47-50).

Plaintiff's benefit cessation claim was denied initially and upon reconsideration. (Tr. 52-61).

Plaintiff then requested and was granted a de novo hearing before an administrative law judge (ALJ). On May 16, 2007 and June 13, 2008, plaintiff, who was represented by counsel, appeared and testified at two hearings before ALJ Ronald T. Jordan. (Tr. 459-492, 493-511). Rhonda Benson, plaintiff's mental health case manager, also testified at the May 16, 2007 hearing. (Tr. 481–92). An impartial medical expert, Georgiann Pitcher, Ph.D., and an impartial vocational expert (VE) also appeared and testified at the June 13, 2008, hearing. (Tr. 498-510).

On August 19, 2008, the ALJ issued a decision determining that plaintiff's benefits were properly terminated and that she was not entitled to benefits based on her February 1994 SSI application. (Tr. 13-29). The ALJ determined that plaintiff suffers from the severe impairments of tendonitis, degenerative disc disease, obesity, carpal tunnel syndrome, a schizoaffective disorder, dysthymia, depression, anxiety, and a personality disorder. (Tr. 15). The ALJ next determined that plaintiff does not have an impairment or combination of impairments that meets or equals the requirements of any impairment set forth in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16) . The ALJ determined that plaintiff retains the residual functional capacity (RFC) to perform a range of light work defined as follows: lifting, carrying, pushing and pulling twenty pounds occasionally and ten pounds frequently; sitting and standing six hours during an eight-hour workday; sitting six hours during an eight-hour workday; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling; no climbing ladders, ropes or scaffolds; avoid hazards such as unprotected heights and unguarded moving machinery; the work must consist of simple and repetitive tasks; no strict or unusually high production quotas; and the work must be performed in a stable, predictable work environment with very few changes from day-to-day. (Tr. 18). The ALJ found that plaintiff's

medically determinable impairments could not reasonably be expected to produce her alleged symptoms, and that plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible. (Tr. 19). Based on the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that plaintiff could perform given her age, education, work experience, and RFC. (Tr. 28). Consequently, the ALJ concluded that plaintiff has not been under a disability, as defined in the Social Security Act, since February 1, 1994. (Tr. 29).

Plaintiff's request for review by the Appeals Council was denied (Tr. 4-6), making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To

3

establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes him from performing the work he previously performed or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 416.920. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). If the impairment meets or equals any within the Listings, disability is presumed and benefits are awarded. 20 C.F.R. § 416.920(d). Fourth, if the individual's impairments do not meet or equal those in the Listings, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981).

4

The Commissioner is required to consider plaintiff's impairments in light of the Listings. The Listings set forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 416.925(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listings, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 416.920(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981).

Plaintiff has the burden of proof at the first four steps of the sequential evaluation process. *Wilson* v. *Commissioner of Social Security,* 378 F.3d 541, 548 (6th Cir. 2004). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon* v. *Apfel,* 168 F.3d 289, 291 (6th Cir. 1999); *Born* v. *Secretary of Health and Human Servs.,* 923 F.2d 1168, 1173 (6th Cir. 1990). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *Wilson,* 378 F.3d at 548. *See also Richardson* v. *Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir. 1984). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *Wilson,* 378 F.3d at 548.

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(l)(A); 1382c(a)(3)(A). The sequential evaluation analyses outlined in 20

5

C.F.R. §§ 416.920 and 416.924 apply to the evaluation of mental impairments. However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three for an adult. 20 C.F.R. § 416.920a. The special procedure also applies when Part A of the Listings is used for an individual under age 18. *Id.* At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." *Rabbers* v. *Commissioner Social Sec. Admin.,* 582 F.3d 647, 653 (6th Cir. 2009) (citing 20 C.F.R. § 416.920a(b)(l)). If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment." *Id.* (citing 20 C.F.R. § 416.920a(c)(3)).

The claimant's level of functional limitation is rated in four functional areas, commonly known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Id.* (citing 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 et seq.; *Craft* v. *Astrue,* 539 F.3d 668, 674 (7th Cir. 2008)). The degree of limitation in the first three functional areas is rated using the following five-point scale: None, mild, moderate, marked, and extreme. *Id.* (citing 20 C.F.R. § 416.920a(c)(4)). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: None, one or two, three, four or more. *Id.* If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. *Id.* (citing § 416.920a(d)(1)). Otherwise, the impairment is considered severe and the ALJ will proceed to step three. *Id.* (citing § 416.920a(d)(2)).

At step three of the sequential evaluation, an ALJ must determine whether the claimant's

impairment "meets or is equivalent in severity to a listed mental disorder." *Id.* A claimant

whose impairment meets the requirements of the Listing will be deemed conclusively disabled.

*Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets

nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC before

completing steps four and five of the sequential evaluation process. *Id.* (citing 20 C.F.R. §

404.1520a(d)(3)).

It is well-established that the findings and opinions of treating physicians are entitled to

substantial weight. "In general, the opinions of treating physicians are accorded greater weight

than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.,*

127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris* v. *Heckler,* 756 F.2d 431, 435 (6th Cir.

1985) ("The medical opinions and diagnoses of treating physicians are generally accorded

substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a

treating physician's opinion is entitled to substantially greater weight than the contrary opinion of

a nonexamining medical advisor. *Shelman* v. *Heckler,* 821 F.2d 316, 321 (6th Cir. 1987). If a

treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's]

impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion

is entitled to controlling weight. 20 C.F.R. § 416.927(d)(2); *see also Blakley* v. *Commissioner,*

581 F.3d 399, 406 (6th Cir. 2009); *Wilson,* 378 F.3d at 544. "The treating physician doctrine is

based on the assumption that a medical professional who has dealt with a claimant and his

maladies over a long period of time will have a deeper insight into the medical condition of the

claimant than will a person who has examined a claimant but once, or who has only seen the

7

claimant's medical records." *Barker* v. *Shalala,* 40 F.3d 789, 794 (6th Cir. 1994). The Social

Security regulations likewise recognize the importance of longevity of treatment, providing that

treating physicians "are likely to be the medical professionals most able to provide a detailed,

longitudinal picture of your medical impairment(s) and may bring a unique perspective to the

medical evidence that cannot be obtained from the objective medical findings alone or from

reports of individual examinations, such as consultative examinations or brief hospitalizations."

20 C.F.R. § 416.927(d)(2).

     If the ALJ does not give the treating source's opinion controlling weight, then the ALJ

must consider a number of factors when deciding what weight to give the treating source's

opinion. 20 C.F.R. § 416.927(d). These factors include the length, nature and extent of the

treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(d)(2)(i)(ii);

*Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source,

how well-supported by evidence the opinion is, how consistent the opinion is with the record as a

whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §

416.927(d)(3)-(6); *Wilson,* 378 F.3d at 544. The ALJ must likewise apply the factors set forth

in § 416.927(d)(3)-(6) when considering the weight to give a medical opinion rendered by a

non-treating source. 20 C.F.R. § 416.927(d). When considering the medical specialty of a

source, the ALJ must generally give "more weight to the opinion of a specialist about medical

issues related to his or her area of specialty than to the opinion of a source who is not a

specialist." 20 C.F.R. § 416.927(d)(5).

     If the Commissioner's decision is not supported by substantial evidence, the Court must

decide whether to reverse and remand the matter for rehearing or to reverse and order benefits

granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043, 1990 WL 94, at *3 (6th Cir. Jan. 2, 1990). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL EVIDENCE

David Downie, M.D., a medical consultant for the South Carolina Vocational

Rehabilitation Department, evaluated plaintiff on March 25, 1994. (Tr. 184–85).  Plaintiff

reported that she had a tenth grade education and no prior mental health treatment. (Tr. 184).  On

mental status examination, plaintiff had poor eye contact, disheveled unkempt dress, poor

hygiene, irritable affect, no suicidal or homicidal ideation, no auditory or visual hallucinations,

and no delusional thinking. (Tr. 184).  She related a history of physical abuse by her mother and

sexual abuse by her stepfather.  *Id.*  Dr. Downie reported that cognitive functioning was difficult

to complete as plaintiff was uncooperative. (Tr. 185).  Dr. Downie diagnosed plaintiff with a

depressive disorder, not otherwise specified.  *Id.*  He did not feel plaintiff was competent to

handle funds on her own behalf.  *Id.*  He recommended that psychological testing be performed.

*Id.*

On April 18, 1994, David Dunbar, Ph.D., a licensed professional counselor, and Linda

Moore, Ph.D., a clinical psychologist, evaluated plaintiff. (Tr. 186–89).  IQ testing revealed a

Verbal IQ score of 58, a Performance IQ score of 49, and a Full-Scale IQ score of 50. (Tr. 187).

Plaintiff was diagnosed with schizoaffective disorder and mild mental retardation based on

clinical observations, test data and interview. (Tr. 188).  They believed that plaintiff's "current

emotional state likely depressed her overall scores but even under optimal conditions it is

unlikely she functions above the Mild Mental Retardation range." (Tr. 187).  They concluded

that the test data suggested that plaintiff has functioned in the mental retardation range of

intelligence since her developmental years.  They opined that plaintiff is able to understand very

short simple instructions but has basically no capacity for dealing with detailed instructions; her

psychological symptoms frequently interfere with her ability to attend and concentrate; she is

very sensitive to criticism and/or perceived slights and will respond inappropriately to such from

supervisors, co-workers, etc.; her ability to deal with even minimal stress is quite poor; her

unusual behaviors would be quite distracting to those around her; she may not be aware of

potentially dangerous situations; and she will require assistance when attempting to navigate in

unfamiliar surroundings. (Tr. 188-89).

In March 2000, plaintiff was referred to Queen City Management/Mitchell Mental Health

Services through MHAP (Mental Health Access Point) because two of plaintiff's children had

been removed from her custody by Children's Services of South Carolina. (Tr. 207–11).

Plaintiff failed to show up for a number of her scheduled appointments. (Tr. 200–06, 209–10).

Plaintiff was diagnosed with depression, personality disorder, and obesity. (Tr. 209). In

September 2002, it was determined that plaintiff "doesn't seem to need psych tx or case

management." (Tr. 201).

Plaintiff was treated at the Jewish Hospital in October 2002 for cold-like symptoms. (Tr.

448–55). Plaintiff reported no "significant past medical history." (Tr. 448). The emergency

room physician noted that plaintiff spoke in full sentences, was alert, fully oriented, and in no

apparent distress. *Id.* The emergency room physician also reported that even though plaintiff

denied any tobacco use, she smelled of tobacco smoke. *Id.* Plaintiff was diagnosed with a viral

illness and discharged in stable condition. (Tr. 449)

As part of the Commissioner's continuing disability review, plaintiff was evaluated by

Susan Kenford, Ph.D., in May 2004. (Tr. 221–27). Plaintiff reported that she was receiving

disability benefits and did not have a payee. (Tr. 221). She further noted that "she has 'never

11

really worked.'" (Tr. 221–22).  Plaintiff told Dr. Kenford that she had been enrolled in special

education classes and had an arrest record for stealing.  (Tr. 222).  She denied alcohol or drug

use.  (Tr. 221).  Plaintiff told Dr. Kenford that she was raising three children, ages 15, 13, and 10,

with the assistance of Children's Services:  "She explained that 'they work with me and they

think I do a good job with my kids.'" (Tr. 221).  Plaintiff claimed that she talked with her case

manager "all the time." (Tr. 222).  When discussing her psychiatrist treatment, plaintiff "was

very hard to follow."  *Id.*  Plaintiff reported that she was receiving mental health treatment from a

psychiatrist, but was "not able to report where she gets her psychiatric care."  *Id.*

> When discussing plaintiff's appearance and behavior, Dr. Kenford noted,

> [Plaintiff's] dress and grooming were poor.  Her hair was extremely disheveled.
> She had on stretch pants.  She was wearing earrings and a necklace.  In contrast to
> the rest of her appearance, her nails were well groomed.  Claimant's behavior was
> unusual and inappropriate.  She had inappropriate affect and laughed sometimes
> for no reason.  She had anger right below the surface.  She fiddled around with
> items in her purse and with a pen during the evaluation.  She shifted frequently.
> She was not able to establish good rapport or make a good connection with the
> clinical evaluator.  With the testing assistant she tried to be friendly and was
> complimentary.  It was very difficult to keep her attention on tasks during testing.
> She showed anxious behaviors during the testing.  Her hands shook, she rocked
> and she looked fearful.  She verbalized that she was anxious.  Asked why she
> was anxious, she stated "I guess because it is so early."  Overall Claimant's
> approach to testing was to be tense and somewhat interested.  Her answers were
> neither eager nor perfunctory and she appeared to try her best.  She did give up,
> however, on difficult items.  Her test motivation was consistent.  Claimant had
> some problems with motor behaviors.  She walked with a slow and awkward gait.
> She had some minor problems negotiating stairs but no problems with sitting.
> She was able to stand without problem.  Her arm and hand movements were
> somewhat impaired due to her shaking.  It was unclear if she understood the
> purpose of the examination.

(Tr. 222).  Plaintiff reported that she relied on her children, case manager, and grandmother for

help with her daily activities.  (Tr. 224).

On IQ testing, plaintiff obtained a Verbal IQ score of 52, a Performance IQ score of 49, and a Full-Scale IQ score of 46. (Tr. 225). Dr. Kenford felt that the IQ scores were a moderate underestimate of plaintiff's true capacity. (Tr. 225). Dr. Kenford diagnosed plaintiff with schizoaffective disorder and mild mental retardation and assigned her a Global Assessment of Functioning (GAF) score of 20.[1] (Tr. 226). Dr. Kenford concluded:

> Claimant meets diagnostic criteria for schizoaffective disorder. She has pronounced depression coupled with thought disorder. Claimant had inappropriate affect, extremely limited social skills, and unusual thought processes. She has a long history of mental health treatment, as well as low functioning. Claimant also has mild mental retardation. Both her cognitive and her adaptive behaviors are extremely impaired. Claimant is living independently in the community with her three children but this is only because she has a case manager with whom she has contact several times per week, as well as a Children's Services case worker. Claimant's overall GAF is considered a 20 because of her symptom severity. Claimant has clear mental health issues that are readily noticeable upon meeting her. Claimant's functioning has always precluded her from being able to work. She has neither the cognitive nor emotional resources to hold a job. Her functional impairment is also considered a 20.

(Tr. 226).

When discussing the Four Work Related Areas, Dr. Kenford opined that plaintiff was severely impaired in her ability to get along with others, including coworkers and supervisors, and extremely impaired in her ability to maintain attention, concentration and persistence. Dr. Kenford considered plaintiff impaired in her ability to perform simple and repetitive tasks, and

---

[1]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 11-20 as having "Some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication." *Id.* at 32.

severely impaired in her ability to manage the everyday stresses and pressures of a work environment. *Id.*

The record contains treatment notes from the Greater Cincinnati Behavioral Health Services (GCBHS) dated between October 2004 and November 2006. (Tr. 229–39, 255–309, 348–437). Plaintiff treated with psychiatrist, Mark Spear, M.D., five times between October 13, 2004 and August 9, 2005, before he left the agency. (Tr. 295-309, 419-28). In March 2005, plaintiff reported that she felt "much better" when on medication. (Tr. 301). The record shows that plaintiff failed to show up for a number of her scheduled appointments. (Tr. 232, 298, 304, 307, 365, 424, 427). The Consumer Identification form from March 2005 and the Demographic Data Sheet from November 2005 show that plaintiff provided misleading information about her past drug use and criminal history. (Tr. 257, 259). The demographic data sheet from November 2006 shows plaintiff's diagnoses as schizoaffective disorder, post-traumatic stress disorder, and personality disorder. (Tr. 255).

Plaintiff saw GCBHS psychiatrist, Lisa Ford-Crawford, M.D., four times between November 8, 2005 and May 8, 2007. (Tr. 359-60, 374-76, 388-90, 404-07). On May 8, 2007, Dr. Ford-Crawford completed a Mental Functional Capacity Assessment. (Tr. 252-53). Dr. Ford-Crawford opined that plaintiff demonstrated marked limitations related to understanding and memory, sustained concentration and persistence, social interaction, and adaption. (Tr. 252). She concluded that plaintiff was unemployable. (Tr. 253).

GCBHS Case Manager, Troy Pendleton, communicated with plaintiff in person or on the telephone at least 17 times between September 24, 2004 and February 3, 2005. (Tr. 273-82, 284-88, 290-91). Mr. Pendleton took plaintiff to the pharmacy to make sure she got her

14

medications (Tr. 274, 276, 280, 284, 286) and helped plaintiff pay her water bill on one occasion and her gas and electric bill on another occasion. (Tr. 273, 290).

GCBHS Case Manager Rhonda Benson communicated with plaintiff in person or on the phone approximately 24 times between December 7, 2004 and May 18, 2007. (Tr. 260-72, 283, 353-54, 357, 361, 372, 377, 379, 386, 391, 393, 402, 408-415, 417-18).

Plaintiff presented in the emergency room at the Jewish Hospital in February 2007 with complaints of nausea, vomiting, and headaches. (Tr. 439–47). Plaintiff was pleasant, alert, and fully oriented; her mood was normal. (Tr. 440). She denied a history of illicit drug use. (Tr. 439). Plaintiff was diagnosed with dehydration and discharged in stable condition. (Tr. 440–41).

## EDUCATIONAL RECORDS

Plaintiff attended the Richland One School District in Columbia, South Carolina, from kindergarten in 1976 to the 9th grade in 1987. Plaintiff had to repeat the second grade. (Tr. 338).

Standardized test scores revealed that in the first grade, plaintiff was in the 3rd percentile. In her second year in the second grade, plaintiff was in the 26th percentile. In the third grade, plaintiff was in the 13th percentile. In the fourth grade, plaintiff was in the 18th percentile. (Tr. 337).

In the fourth grade, plaintiff was found to have unsatisfactory cooperation with her teacher in learning experiences, working well independently, and developing effective work habits. In the fifth grade she was unsatisfactory in cooperating with classmates, developing effective work habits, valuing personal and public property, and showing growth in self control. (Tr. 338). In the fifth grade, a school health record noted that plaintiff walked with an abnormal

15

gait, tired easily, and had poor food habits, frequent inattention, and undue restlessness. (Tr. 339).

Plaintiff's grade point average was 2.03 in the sixth grade. In the seventh grade she earned mostly Ds and Fs and was promoted to the eighth grade by "special promotion." (Tr. 335). In the eighth grade she earned only Ds and Fs and was moved into ninth grade by "special promotion." *Id.*

## CONTINUING DISABILITY REVIEW

As part of the Commissioner's continuing disability review, Cynthia Hammond, a Disability Claims Adjudicator, interviewed plaintiff on April 27, 2004. (Tr. 132-33). Plaintiff reported that she had "no problems caring for her [three] children." (Tr. 132). Plaintiff also reported she had a friend, Phyllis Townsend, who helped plaintiff with a court case against her landlord and who helps her count her money when making store purchases. *Id.* Ms. Hammond concluded:

> Understands we may need CE. Capable. **Claimant's conversation did not seem to reflect the very low IQ's of V-58, P-49 and FS-50 which were done at age 22. Her conversation/verbal abilities would be judged at at (sic) least average. She pronounced more difficult words correctly, such as her med names and gave a very concise and coherent story about the landlord stealing her electricity. In fact, she states she is a PAYEE for another person! She was proud that she is raising three children by herself and in addition is a payee for someone.

(Tr. 133).

A Report of Contact on April 30, 2004, shows that the Commissioner tried to arrange a consultative examination to assess plaintiff's mental functioning. (Tr. 135). Plaintiff refused: "[S]he reported she did NOT wish to attend CE because the claimant for whom she is payee saw a consultant and they tried to cease his benefits . . . . We talked at length about the CE and while

I tried to convince her to attend, she is adamant she does not want to go." (Tr. 135). Ms. Hammond believed plaintiff was "very capable of understanding the consequences" of her decision. (Tr. 135). Plaintiff called back a half hour later to "to say she had thought it over and decided she DID want to attend the CE." (Tr. 137).

When Ms. Hammond spoke with plaintiff on May 18, 2004, plaintiff reported that she helped another disability beneficiary, with whom she lived and for whom she was the payee, manage his personal finances. (Tr. 138-39). Ms. Hammond described plaintiff as "very capable," "quite pleasant," and "polite." *Id.*

Plaintiff told Ms. Hammond on June 7, 2004, that she was receiving mental health treatment through Queen City Management. (Tr. 140). However, Queen City Management reported plaintiff was last treated in June 2002. (Tr. 140–41). Plaintiff later admitted she had not received mental health treatment for at least two years: "I then asked for her case manager's number so I could call and find out why they don't have records beyond 6/02. She said 'well if that's what they say it must be right.' She therefore admitted she probably had not been there for two years and has not rec'd any tx in between." *Id.* Also on June 7, 2004, plaintiff reported that she helped her grandmother with household chores. (Tr. 142–43).

As part of her investigation, Ms. Hammond spoke with Teresa Davis, a case manager with Hamilton County Children's Services, on June 8, 2004. (Tr. 149-50). Ms. Davis reported that she had met with plaintiff that year to address allegations regarding her son. (Tr. 149). Ms. Davis "did not at all perceive clmt as one who is intellectually limited." *Id.* Plaintiff "presented herself well, spoke well and was dressed in an average way." *Id.* Ms. Davis was "astounded" to learn that plaintiff was receiving disability benefits due to low intellectual functioning. (Tr. 150).

Ms. Hammond further noted that: "Ms. Davis reported clmt did not speak in 'little girl's voice' as she does with me." (Tr. 150).

Ms. Hammond attempted to contact Phyllis Townsend, a friend who plaintiff said helped her with transportation and finances, using a phone number provided by plaintiff. (Tr. 151–52). No one answered. (Tr. 151). The answering machine recording did not include a name. *Id.* Within ten minutes, Ms. Hammond received a call from an individual identifying herself as "Ms. Townsend." *Id.* According to Ms. Hammond, the individual sounded "AMAZINGLY like the clmt." (Tr. 151).

Ms. Hammond's referral report to the Cooperative Disability Investigation Unit (CDIU) stated that Hammond suspected fraud: "VERY HIGH SUSPICION OF FRAUD IN THIS CASE. There are so many inconsistencies/conflicts, don't know where to begin!" (Tr. 146). According to Ms. Hammond, a "[p]reponderance of evidence shows clmt has misrepresented herself many times over." (Tr. 147). Ms. Hammond reported that plaintiff's day-to-day functioning appeared to be "much higher than one would expect with IQs of 40–50." *Id.* Ms. Hammond found it "very difficult to believe this claimant has mild to moderate mental retardation." *Id.* Ms. Hammond further noted that plaintiff had a tenth grade education, exhibited an average ability to write and spell, managed her personal finances, and served as a disability payee. *Id.*

Ms. Hammond reported to the CDIU that plaintiff misrepresented the number of children living with her. Though plaintiff claimed that she lived with three children, two of her children had been taken away from her by the South Carolina Department of Social Services. Ms. Hammond also reported that plaintiff misrepresented the nature and scope of her mental health

18

treatment. Though plaintiff claimed that she was currently receiving mental health treatment, she had not received such treatment for at least two years. Ms. Hammond noted that plaintiff misrepresented the nature and scope of her daily activities. Plaintiff informed Ms. Hammond that she was capable of performing most of her daily activities independently and actually helped her grandmother with household chores. (Tr. 147). Ms. Hammond questioned whether plaintiff had been truthful about her condition from the outset of her disability application. (Tr. 148).

The Office of Inspector General (OIG) issued a Report of Investigation on September 27, 2004. (Tr. 158–68). Based on its investigation, the OIG determined that plaintiff's disability benefits had been procured by fraud. (Tr. 167). Information provided by plaintiff was "deemed to be not credible." *Id.* The OIG found that plaintiff misrepresented her work history; was not cooperative during IQ testing; and misrepresented the nature and scope of her intellectual functioning. The OIG also found that plaintiff's IQ scores were "inconsistent with her reported 10th grade education, independent functioning in the community & her ability to manage her family's finances unaided, prior to the exam." (Tr. 167). Plaintiff's ability to serve as payee for a mentally disabled adult claimant was "inconsistent with IQ scores in the mild to moderate range of mental retardation." *Id.* The OIG further found that plaintiff's participation in credit card fraud was "not consistent with mild to moderate levels of mental retardation or an inability to do simple addition and subtraction problems." *Id.* The OIG reported that plaintiff's behavior during consultative examinations was inconsistent with that witnessed by others outside of the disability application process. (Tr. 167–68). The OIG determined that plaintiff misled consultative examiners about, *inter alia*, her work history, treatment history, and drug use. It was also noted that she used two different names and two different Social Security numbers. (Tr.

19

159–61, 168). The OIG concluded that "[a]ll of [plaintiff's] functional statements as well as

findings from the consultative psych exams, which were based on [plaintiff's] self-reported

symptoms, must be disregarded." (Tr. 168).

## THE ADMINISTRATIVE HEARINGS

Plaintiff testified at the administrative hearing held on May 16, 2007, that she has lived

alone since her children were taken away when she lived in North Carolina. (Tr. 469). She had

worked part-time jobs following the 1994 disability determination. (Tr. 466–69). She has a

driver's license and used to drive. (Tr. 471-72). She has a vehicle but it is not operational. *Id.*

She managed her own personal finances and paid for her bills with money orders. (Tr. 478-79).

Rhonda Benson, plaintiff's case manager at GCBHS, also testified as a fact witness at the

May 16, 2007 administrative hearing. (Tr. 481–92). Ms. Benson testified that she had known

plaintiff since December 2004. (Tr. 481). Ms. Benson agreed with the assessment of GCBHS

psychiatrist, Dr. Ford-Crawford, that plaintiff was extremely limited in her ability to interact

appropriately with the general public based on her observations that plaintiff "becomes extremely

agitated around people. It took a long time for me to get to know her for that reason. When she

was originally assigned to me, I had a very difficult time engaging her in services. She becomes

very agitated." (Tr. 482-83). Ms. Benson next gave examples of how plaintiff's ability to

function is impaired. (Tr. 483-87). Ms. Benson also agreed with Dr. Ford-Crawford that

plaintiff was unemployable. (Tr. 487). Ms. Benson also testified that in her career she had

worked with clients who she suspected were faking and when asked if she thought plaintiff was

faking testified, "I really don't. I think that if Claritte were capable of going to work, I think she

20

would do it.  She has a certain pride that I don't see in all of my clients.  I think she would like to be able function more normally, and to provide for herself." (Tr. 489).

Plaintiff testified at the administrative hearing held on June 13, 2008, that she was taking medication for anxiety, and Percocet for her back, arm, and leg. (Tr. 497).  She was no longer receiving services at GCBHS due to transportation issues. (Tr. 497-98).  She does not know how long it had been since she had received services. (Tr. 498).  Plaintiff also testified that she still lives by herself and handles her own money. (Tr. 502).  She shopped in stores and used public transportation to get around. (Tr. 503).

Dr. Georgiann Pitcher, a clinical psychologist, testified as the medical expert at the June 13, 2008 administrative hearing. (Tr. 498–506).  Dr. Pitcher testified she had no reason to believe that plaintiff's low IQ scores were not valid. (Tr. 501).  Dr. Pitcher did not observe any statistical irregularities or anything in the testing that may indicate that plaintiff's IQ scores were invalid.  *Id.*  Dr. Pitcher testified that plaintiff's activities of daily living are "at least moderately, if not seriously affected," noting that plaintiff has "had a great deal of assistance and [is] not completely independent." (Tr. 505).  She also testified that plaintiff's concentration, persistence, and pace "would be very seriously affected." (Tr. 505).  Dr. Pitcher agreed that plaintiff has deficits in adaptive functioning. (Tr. 506).  Dr. Pitcher further testified that during her mental health treatment, plaintiff's GAF scores "have never been over 45, and those are - they're an assessment of her functioning." *Id.*

The ALJ's hypothetical question to the VE assumed an individual of plaintiff's age and education, with no work history, who was limited to simple or repetitive tasks. (Tr. 507).  The individual should not be subject to strict, unusually high time or production quotas.  The

21

individual should work at a stable, "predictable work environment with no changes–with very

few changes from day to day." *Id.* The VE responded that such an individual could perform jobs

as a hand packer and packager at the sedentary, light, medium, and heavy levels of exertion. (Tr.

507-08). The VE also testified there would be positions as janitors, cleaners, landscaping

workers, and grounds keeping workers at the light, medium, and heavy levels of exertion. (Tr.

508).

The second hypothetical assumed that an individual of plaintiff's age and education who

has the same psychological limits, but who is limited to lifting, carrying, pushing, or pulling up

to 20 pounds occasionally and 10 pounds frequently; the individual can stand and walk six hours

in an eight-hour day and sit six hours in an eight-hour day; the individual could occasionally

perform postural activities such as stooping, crouching, crawling, kneeling, balancing, and

climbing stairs or ramps; the individual should avoid hazards such as unprotected heights or

unguarded moving machinery; and the individual should not be required to climb ladders,

scaffolds, or ropes. (Tr. 508). The VE responded that he would endorse the numbers that he

gave previously for sedentary and light jobs. *Id.* The VE next provided the *Dictionary of*

*Occupational Titles* numbers for the jobs he previously provided. (Tr. 508-09).

When asked by plaintiff's counsel if there were jobs plaintiff could perform if plaintiff

were limited as assessed by Dr. Kemper, the consultative psychologist, the VE responded, "I

would support the idea that there was no work that a person could perform." (Tr. 509).

## OPINION

Plaintiff assigns two errors in this case. First, plaintiff contends the ALJ's decision to

disregard the medical evidence is not supported by substantial evidence. (Doc. 7 at 3). Second,

plaintiff argues that the ALJ's conclusions about the non-medical evidence are not supported by substantial evidence.

## I.  Plaintiff's first assignment of error should be sustained.

Plaintiff contends the ALJ erred when he dismissed the medical evidence supporting a finding that plaintiff meets a Listing and would be unable to perform substantial gainful activity based on her additional functional limitations without citing to any contrary medical evidence to support his conclusion.  The examining and treating physicians in this case have consistently reported extreme and marked deficits in plaintiff's functioning based on her mental impairments.  The examining medical sources in this case administered psychological tests and concluded that plaintiff functions in the mental retardation range of intelligence and is extremely limited in her ability to deal with work stresses.  (Tr. 188-89, 221-227).  Plaintiff's treating physician, Dr. Ford-Crawford, reported that plaintiff demonstrated marked limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaption.  (Tr. 252).

In addition, Dr. Pitcher, the medical expert who testified at plaintiff's second hearing, testified that based on her review of the medical evidence of record, plaintiff's IQ scores, coupled with her deficits in adaptive functioning[2] and the presence of additional psychiatric impairments, met Listing 12.05C for mental retardation.  Dr. Pitcher testified that her review of the psychological testing showed low IQ test scores that were within the parameters of Listing 12.05 for mental retardation.  (Tr. 500).  Dr. Pitcher found no reason to question the validity of the IQ

---

[2]"Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." Diagnostic and Statistical Manual of Mental Disorders, 4th Ed., (DSM IV)(2000) at page 42.  Mental retardation requires concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *Id.* at 49.

scores and testified that the scores would still meet Listing level severity even given the standard

error measurement of six or more points. (Tr. 501). Dr. Pitcher testified that plaintiff also had

deficits in adaptive functioning as required under Listing 12.05C. Dr. Pitcher noted that plaintiff

has had a service plan through GCBHS for a very long time and that her daily activities are at

least moderately if not seriously affected. (Tr. 505). Dr. Pitcher noted that plaintiff gets a great

deal of assistance from others and is not completely independent; she is not a social person and is

very isolated at times; she will not come to the door when her case manager visits; and her

concentration, pace, and persistence would be reflected in the IQ and "would be very seriously

affected also." (Tr. 505). Dr. Pitcher also noted that plaintiff has the additional diagnoses of a

schizoaffective disorder, an anxiety disorder, and a personality disorder, which is characterized

by inflexible behavior, and were part of plaintiff's "whole picture." (Tr. 504, 506).

The ALJ declined to accept Dr. Pitcher's opinion. His decision states:

> I note the testimony of Dr. Pitcher, basically supporting the low IQ scores and
> finding marked deficits in the "paragraph B" criteria. However, Dr. Pitcher was
> not provided the evidence regarding the investigation by the Office of the
> Inspector General, or other evidence casting serious doubt on the credibility of the
> claimant. Accordingly, I do not accept the opinion of Dr. Pitcher as it is not well
> supported by the evidence of record taken as a whole.

(Tr. 27).

Plaintiff contends that in rejecting the opinion of Dr. Pitcher, the ALJ erred by not giving

the medical expert the opportunity to review the entire record and explain her opinion in relation

to the entire record. The Court agrees.

At the hearing, the ALJ expressed surprise that Dr. Pitcher was not given the information

about the fraud investigation. (Tr. 505). The ALJ stated that he thought he had made a copy of

the whole file for Dr. Pitcher and when Dr. Pitcher advised that she had only the medical file, the

24

ALJ stated, "Well, that's unfortunate" and that he had "no idea why [she] didn't get that prior evidence." (Tr. 505-506).

The ALJ's questions and comments to the medical expert, as well as his written decision, indicate that plaintiff's credibility was an important factor in determining the weight to afford the medical opinions of the treating physicians, the consultative examiners, and the medical expert in this case. Yet, the ALJ failed to obtain any *medical* opinion on the impact, if any, of plaintiff's credibility on whether she meets Listing 12.05C or on the validity/supportability of the assessments by the treating and examining physicians and psychologists in this case. The reports of the consultative examiners do not indicate that the psychological testing performed on plaintiff was invalid. Nor did the ALJ cite to any evidence from plaintiff's treating psychiatrists or case managers that they suspected plaintiff was "faking" her mental illness. Based on the medical evidence reviewed by Dr. Pitcher, she opined that plaintiff met Listing 12.05C. Whether her opinion would have been different had she be given the other non-medical reports which questioned plaintiff's credibility is unknown. The Court notes that an "ALJ must make every effort to obtain all essential documentary evidence early enough to allow the ME [medical expert] . . . sufficient time to consider the evidence before he or she responds to questions at a hearing or answers written interrogatories." *See* Hearings, Appeals and Litigation Law Manual of the Social Security Administration (HALLEX) I-2-5-30.[3] *See also Bowie v. Commissioner*, 539 F.3d 395, 399 (6th Cir. 2008) (while not binding on the court, the HALLEX offers procedural guidance which may be considered). Although the ALJ realized that Dr. Pitcher did

---

[3]The HALLEX is a Social Security Administration policy manual that provides "guiding principles, procedural guidance and information" to ALJs and other staff members. *See Bowie*, 539 F.3d at 397.

not have the benefit of the non-medical evidence upon which the ALJ ultimately relied to reject

her opinion and the other medical source opinions of record, he nevertheless made no effort to

provide Dr. Pitcher with this evidence subsequent to the hearing, to continue the hearing, or to

follow-up with interrogatories to Dr. Pitcher to resolve the issue. His failure to do so in this case

leaves the Court without a basis for meaningful judicial review on the question of the impact of

plaintiff's credibility on her ability to function *from a medical perspective*. Instead, the ALJ

chose to discount the critical elements of each medical opinion (*i.e.,* those which indicated she

would be disabled under Social Security standards) on the basis that plaintiff misrepresented

herself as a "mentally/intellectually impaired" person to the treating and examining sources

solely for the purpose of obtaining disability benefits. Plaintiff's behavior may or may not be

pertinent to her diagnoses or level of functioning, and may in fact be symptomatic of her mental

illness. *See* May 4, 2004 Diagnostic Assessment Form from MHAP (Tr. 436).[4] The Court is

simply unable to discern this on the basis of the instant record because the record lacks any

medical source opinion on the issue. As a result, the Court concludes that the ALJ's decision to

discredit all of the medical findings supporting plaintiff's extreme and/or marked deficits in

adaptive functioning and her ability to maintain attention, concentration, and persistence based

on the ALJ's belief that plaintiff is not worthy of credence is not supported by substantial

---

[4]While plaintiff presented as "manipulative at times" during the examination, as noted by the ALJ (Tr. 27, 436), the examiner indicated that plaintiff's manipulative behavior was indicative of a personality disorder (Tr. 436), a diagnosis which the ALJ accepted. *See Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000) (malingering and manipulation are symptoms of anti-social personality disorder) (citing Diagnostic and Statistical Manual of Mental Disorders, 646 (4th ed. Amer. Psych. Assn. 1994) ("individuals with Antisocial Personality Disorder . . . may repeatedly lie, use an alias, con others, or malinger."). *See also Cheney v. Commissioner of Social Sec.*, No. 5:10-cv-174, 2011 WL 1839785, at \*10 (D. Vt. April 19, 2011) ("where the evidence reveals malingering or manipulation by a claimant with a personality disorder, the ALJ may not substitute his lay opinion regarding the claimant's credibility for that of a medical expert, given that individuals with personality disorders may repeatedly lie, con others, or malinger and thus these symptoms may actually support rather than contradict the medical experts' ultimate conclusions.").

evidence. This matter should be remanded for the purpose of obtaining an updated opinion from

the medical expert on the effect, if any, of the evidence of plaintiff's credibility on her diagnoses

and functional limitations.

In addition, the ALJ declined to give controlling weight to plaintiff's treating psychiatrist,

Dr. Ford-Crawford, without stating the amount of weight, if any, he did give to Dr. Ford-

Crawford's opinion. (Tr. 26). The ALJ stated that he gave Dr. Ford-Crawford's opinion

"appropriate consideration" but was unable to give it controlling weight. *Id.* The ALJ erred in

this regard.

Even where the ALJ determines not to give the opinion of a treating physician controlling

weight, Social Security regulations and the law of the Sixth Circuit nonetheless require the ALJ

to determine and articulate on the record the amount of weight given to the opinion. *See* 20

C.F.R. § 404.1527(d); *Wilson v. Commissioner*, 378 F.3d 541 (6th Cir. 2004). Social Security

Ruling 96-2p provides in relevant part:

> Adjudicators must remember that a finding that a treating source medical opinion
> is not well-supported by medically acceptable clinical and laboratory diagnostic
> techniques or is inconsistent with the other substantial evidence in the case record
> means only that the opinion is not entitled to 'controlling weight,' *not that the
> opinion should be rejected.* Treating source medical opinions are still entitled to
> deference and must be weighed using all of the factors provided in 20 C.F.R.
> 404.1527 and 416.927. *In many cases, a treating source's medical opinion will
> be entitled to the greatest weight and should be adopted, even if it does not meet
> the test for controlling weight.*

SSR 96-2p (emphasis added). *See also Blakley,* 581 F.3d at 408 (even where treating physician

not afforded controlling weight by ALJ, that does not mean treater's opinion should be rejected).

As explained by the Sixth Circuit in *Wilson,* "If the opinion of a treating source is not

27

accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (discussing 20 C.F. R. § 404.1527(d)(2)).  The ALJ must satisfy the clear procedural requirement of giving "good reasons" for the weight accorded to a treating physician's opinion: "[A] decision denying benefits 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' Social Security Ruling 96-2p, 1996 WL 374188, at *5 (1996)." *Wilson*, 378 F.3d at 544.  The specific reasons requirement exists not only to enable claimants to understand the disposition of their cases, but to ensure "that the ALJ applies the treating physician rule and permit[] meaningful review of the ALJ's application of the rule." *Id.*  Only where a treating doctor's opinion "is so patently deficient that the Commissioner could not possibly credit it" will the ALJ's failure to observe the requirements for assessing weight to a treating physician not warrant a reversal. *Id.* at 547.

In the instant case, the ALJ declined to give controlling weight to Dr. Ford-Crawford's functional assessment, stating that the treating psychiatrist examined plaintiff on only four occasions in almost two years, and that plaintiff "functions pretty well" when she is compliant with her medications as "exhibited by her daily and social activities . . . which include raising

children and maintaining a household." (Tr. 26).  These were the only reasons given by the ALJ for declining to give "controlling weight" to the treating physician's opinion.

The ALJ's decision does not reflect an analysis of the regulatory factors or an indication of the weight he actually accorded to Dr. Ford-Crawford's assessment.  Dr. Ford-Crawford is a medical doctor specializing in psychiatry.  The frequency with which Dr. Ford-Crawford has examined plaintiff is one of many regulatory factors the ALJ must consider in assessing weight to the treating physician.  Her assessment of plaintiff's mental functional capacity is consistent with those of the other examining psychologists and the observations of the mental health case managers in this case.  By failing to consider the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight to be given the opinion of Dr. Ford-Crawford, the ALJ's rejection of the treating psychiatrist's assessment of plaintiff's functional capacity is not supported by substantial evidence.  *Cole v. Astrue*, __ F.3d at __, 2011 WL 2745792, at *6 (6th Cir. July 15, 2011) ("[T]he ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'") (quoting *Blakely,* 581 F.3d at 407).  The Court cannot say that Dr. Ford-Crawford's opinion "is so patently deficient that the Commissioner could not possibly credit it" so as to excuse the ALJ's failure in this case.  The ALJ's decision in this respect constitutes legal error warranting a reversal and remand of this case for reconsideration of plaintiff's RFC, with proper analysis of the weight to be given Dr. Ford-Crawford's functional capacity assessment consistent with the treating source regulation, 20 C.F.R. § 416.927(d).  *Wilson*, 378 F.3d at 546.

**II. Plaintiff's second assignment of error should be sustained in part and denied in part.**

Plaintiff contends the ALJ's reliance on non-medical evidence to support his conclusion that plaintiff is not markedly restricted in activities of daily living, social functioning, and concentration, persistence and pace is not supported by substantial evidence. Plaintiff contends that the ALJ mischaracterized her school performance, thereby undermining the ALJ's credibility determination. Plaintiff also argues the ALJ's citation to plaintiff's comments about her ability to care for her children ignores the evidence that: two of her three children were removed from her custody years ago; Children's Protective Services had been contacted several times in relation to her care of her remaining child; and she was previously charged with child endangerment, which shows she actually has marked limitations in performing activities of daily living and social functioning. Finally, plaintiff asserts the ALJ's use of non-medical evidence of an alleged fraud to dismiss all of the medical evidence from the medical professionals who observed and tested plaintiff is without substantial support in the record.

The Commissioner argues that the ALJ's credibility finding is well-supported by the evidentiary record. The Commissioner asserts that plaintiff's credibility was a significant factor in the ALJ's assessment of all the medical source opinions, especially those bearing upon plaintiff's ability to perform activities of daily living, maintain social functioning, and maintain concentration, persistence, or pace. The Commissioner contends that because the physicians who evaluated plaintiff based their findings in large measure on the subjective information provided by plaintiff, the ALJ was justified in discounting those opinions based on the non-medical evidence of plaintiff's lack of credibility. (Doc. 14 at 19, citing *Smith v. Commissioner of Social Sec.*, 482 F.3d 873, 877 (6th Cir. 2007)).

The ALJ's decision sets forth in detail the reasons for his credibility finding. The ALJ cited to numerous factors in assessing plaintiff's credibility, including plaintiff's criminal history; the "Ms. Townsend" incident, where plaintiff allegedly misrepresented herself as a third person contact to the disability claims adjudicator; plaintiff's reported daily activities; her inconsistent reports about education, substance abuse and legal charges; her presentation as articulate, lucid, neat in appearance, and with no abnormal mannerisms or voice to investigators of the Office of the Inspector General and to a children's services worker, in contrast to her presentation at the two hearings where she spoke in a child-like and sing-song voice and constantly rocked back and forth in her seat ("that of an individual who had serious intellectual and mental handicaps"); and the timing and inconsistency of plaintiff's treatment. (Tr. 20-27). Although plaintiff has presented plausible, alternative explanations for several of the reasons cited by the ALJ, even if substantial evidence would support the opposite conclusion, the Court must uphold the ALJ's credibility decision where, as here, it is supported by substantial evidence. *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001). The ALJ's decision reflects that he properly considered the required factors in determining plaintiff's credibility and reasonably concluded that plaintiff was not credible. *See* 20 C.F.R. § 416.929(c). In light of the ALJ's opportunity to observe plaintiff's demeanor, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Kirk,* 667 F.2d at 538. *See also Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997); *Gaffney v. Bowen*, 825 F.2d 98, 101 (6th Cir. 1987). Accordingly, the Court finds substantial evidence supports the ALJ's credibility finding in this matter.

However, and contrary to the Commissioner's argument, the ALJ's credibility finding does not in itself justify the ALJ's decision to discredit the medical opinions assessing plaintiff's

31

ability to maintain activities of daily living, social functioning, and concentration, persistence, and pace. The Court recognizes that the Sixth Circuit has upheld an ALJ's rejection of a physician's opinion where it is based "solely" on the claimant's "reporting of her symptoms and her conditions," which the ALJ determined not to be credible. *See Smith v. Commissioner*, 482 F.3d 873, 877 (6th Cir. 2007). Here, unlike *Smith*, the reports of the consultative examining and treating physicians are not based "solely" on plaintiff's subjective reports, but on psychological testing and clinical examinations as well. There is no indication in the medical records that plaintiff was malingering or "faking" her mental illness. Moreover, Dr. Ford-Crawford, as part of a mental health team which included case managers who followed plaintiff over a period of years, had the benefit of the case managers' observations and interactions with plaintiff in addition to her own clinical examinations before assessing plaintiff's mental functional capacity. The Court also notes that plaintiff's case managers' observations and interactions with plaintiff appeared to be particularly significant to Dr. Pitcher in assessing plaintiff's adaptive functioning at the hearing. (Tr. 505). As discussed above, the ALJ was unable to elicit the assistance of Dr. Pitcher to gain an understanding of the significance, if any, of plaintiff's credibility on her mental functioning and whether plaintiff's behavior was consistent with her mental impairments. Therefore, this matter should be remanded for further proceedings, including the retention of a medical expert opinion on the effect, if any, of plaintiff's credibility on the medical opinions in this matter.

In view of the Court's recommendation to remand this matter pursuant to Sentence Four of 42 U.S.C. § 405(g), the Court need not reach plaintiff's alternative argument (Doc. 17 at 8-9)

that she is entitled to a remand under Sentence Six of § 405(g) based on new and material evidence.

## IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _8/15/2011_

Karen L. Litkovitz
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CLARITTE QUATTLEBAUM,                         Case No. 1:10-cv-399
    Plaintiff                                    Barrett, J.
                                   Litkovitz, M.J.

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

34